**Juanita M. JONES**

v.

**Floretta Dukes McKENZIE, Superintendent of Schools, et al., Appellants.**

No. 86–5198.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 2, 1987.

Decided Nov. 17, 1987.

Charles L. Reischel, with whom Frederick D. Cooke, Jr. and James R. Murphy were on the brief, for appellants.

David A. Soley, with whom Jeffrey A. Dunn, Gary M. Hnath, Arthur B. Spitzer and Elizabeth Symonds were on the brief, for appellee.

Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, were on the brief for amicus curiae, U.S., urging reversal in part.

Before EDWARDS, STARR and D.H. GINSBURG, Circuit Judges.

Opinion for the Court by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This case involves a suit by the appellee, Juanita Jones, against the District of Columbia and those officials in the District of Columbia Public School System responsible for the employee drug-use surveillance program.[1] Ms. Jones, who had been employed in the Transportation Branch, challenged the School System's decision to discharge her for an alleged violation of a directive prohibiting school personnel from using, possessing or being under the influence of illicit drugs while on school premises. In granting summary judgment in appellee's favor, the District Court ordered Ms. Jones reinstated with full backpay, seniority and benefits; enjoined the appellants from terminating Ms. Jones on the basis of the EMIT drug test without confirmation from some adequate alternative testing device; and enjoined the appellants from administering any urinalysis drug test to Ms. Jones "without first establishing probable cause to believe that she is using or under the influence of illicit drugs based on specific objective facts." The School System has appealed only that portion of the District Court's order that prohibits compulsory drug testing without "probable cause."

■ On the record before us, we find that it is not unreasonable to require drug testing where an employee's duties involve direct contact with young school children and their physical safety, where the testing is conducted as part of a routine, reasonably required, employment-related medical examination, and where there is a clear nexus between the test and the employer's legitimate safety concern. We therefore reverse the District Court's judgment, 628 F.Supp. 1500, pertaining to "probable cause," and vacate that portion of its injunction from which appeal was taken.

## I. BACKGROUND

In 1984, the School System initiated a program of mandatory drug testing for employees in its Transportation Branch. These employees included bus drivers, mechanics and bus attendants, whose primary duty was the daily transportation of handicapped students between their homes and schools.[2] The drug testing program had its impetus in growing concern among School System officials over a perceived "drug culture" in the Transportation Branch. There were repeated incidents of bizarre or dangerous drug-related behavior by drivers and attendants while on duty;[3] syringes and bloody needles were found in restrooms used by Transportation Branch employees; and the head of the Branch estimated "that 60% of the employees assigned to the Transportation Branch are using narcotics to some extent." Letter from William French to William Bedford (May 17, 1984) ("French Letter"), Record Excerpts ("R.E.") 34–35; Defendants' Interrogatory Answer 6, R.E. 48. Efforts to deal with the problem had yielded only mixed results. French Letter, R.E. 35–36.

The School System's concern about drug use culminated in Superintendent's Di-

---

1. The appellants, collectively, hereafter will be referred to as the "School System."

2. The Branch also transported other students to athletic and special events.

3. For example, one bus attendant "went into an uncontrolled coma and passed out on the floor of the bus;" another "went off" in a supervisor's office, "screaming, laughing, rolling in [sic] the floor, disarrying [sic] her dress, etc." A driver trainee who "could see little green soldiers coming up out of the black top" tried to enlist co-workers and supervisors in his army and saw a parked bus as a combat jeep. Letter from William French to William Bedford (May 17, 1984), Record Excerpts 34–35.

rective 205.1, issued June 12, 1984, which provided for mandatory urinalysis testing "of all employees who are or will be required to undergo medical examinations to determine physical fitness for licensing and other employment-related reasons." R.E. 39.[4] It added that a "confirmed finding of an illicit narcotic substance in the urine of an employee" or a refusal to submit to testing would be "grounds for termination." R.E. 40. The employees were informed in advance that the physical examinations would include urinalysis testing for drugs. Bedford Memorandum (June 22, 1984), R.E. 43. Both Directive 205.1 and the notification to employees explained that the purpose of the drug tests was the enforcement of Superintendent's Directive 662.13, dating from 1977, which prohibited school personnel "to possess, use or be under the influence of intoxicating liquors, narcotics, or other drugs such as LSD, marijuana and the like, while on school premises." Supplemental Record Excerpts ("S.R.E.") 87.

Pursuant to the newly issued directive, Transportation Branch employees were administered physical examinations at a clinic during the summer of 1984. As is the normal procedure in medical examinations, they were permitted to produce their urine specimens in the privacy of a restroom. The urine samples were tested with the EMIT Cannabinoid Urine Assay. A total of 26 Transportation Branch employees classified as WAE (when actually employed) tested positive for illegal drugs and

were "terminated." Defendants' Interrogatory Answer 19 & attachment C, Record Document ("R.D.") 18.[5]

Appellee Juanita Jones was employed, on a WAE basis, as a school bus attendant in the Transportation Branch beginning in February 1981. As such, she was paid for hours actually worked (averaging 30–35 per week), received no leave or other benefits, and was reemployed each year for a one-year term "subject to the availability of funds." In her job, Jones was responsible for assisting handicapped children on and off the bus. In some cases this required physically carrying the child. She was also responsible for ensuring that the children were properly seated and for maintaining order during the sometimes lengthy bus trips. She was considered to be an excellent employee. S.R.E. 30, 56, 82–86.

Jones underwent a physical examination and was tested for drugs along with other Transportation Branch employees in the summer of 1984. Her test was positive for THC metabolites, an indication of marijuana use.[6] Upon learning of Jones' test result, the School System terminated her employment. Following the School System's denial of Jones' request for a hearing and its rejection of her written appeal, she filed suit in the District Court, seeking injunctive relief and damages under 42 U.S.C. § 1983 for violation of her rights under the Fourth and Fifth Amendments and District of Columbia statutes.

On February 25, 1986, the District Court entered partial summary judgment for

---

**4.** While theretofore only bus drivers had been required to undergo annual physical examinations, that policy was changed to require such examinations of all Transportation Branch employees. French Memorandum (June 19, 1984), R.E. 41.

Directive 205.1 also provided that any employee could be tested "who displays behavior or actions which can be construed as a threat to the safety or well being of the students, staff, and public or are detrimental to the effective functioning of programs and activities of D.C. Public Schools." R.E. 39. This provision is not involved in the present litigation.

**5.** The record contains no information on how many full-time employees tested positive and whether they were also fired.

**6.** Jones contends that she never used marijuana or any other illegal drugs during her period of employment with the School System. Plaintiff's Pretrial Statement, S.R.E. 30. In a letter to the Superintendent of Schools she stated that during the weekend prior to the positive test she had been in the presence of several people who were smoking "something other than tobacco." Letter from Juanita Jones to Floretta D. McKenzie (undated), Defendants' Document Production, Exhibit I, R.D. 18, *reprinted in* Brief for Appellants at 9. The District Court found that the EMIT test "does not indicate with respect to marijuana whether the ingredient was ingested by active use or as a result of passive inhalation in the presence of others who were smoking marijuana." *Jones v. McKenzie,* 628 F.Supp. 1500, 1503 (D.D.C.1986).

Jones. It held that her termination on the basis of a single, unconfirmed EMIT test, without a hearing, was arbitrary and capricious and thus violative of District of Columbia law.[7] It also held that, "in the absence of particularized probable cause," requiring her to submit to drug testing was an unreasonable search. The trial court ordered Jones reinstated with full backpay, seniority and benefits; ordered that any mention of the termination be expunged from her personnel records; enjoined the School System from terminating her on the basis of the EMIT test without adequate confirmation by other means; required that any future termination be preceded by meaningful notice and an opportunity to be heard, and followed by the right to a hearing; and enjoined the School System from administering any drug test to her "without first establishing probable cause to believe that she is using or under the influence of illicit drugs based on specific objective facts." *Jones v. McKenzie*, No. 85–1624 (D.D.C. Feb. 25, 1986) (order), *reprinted at* R.E. 31–32; *Jones v. McKenzie*, 628 F.Supp. 1500 (D.D.C.1986). Jones' claim for damages was subsequently settled.

The School System has acquiesced in most of the District Court's order. It appeals only the trial court's Fourth Amendment ruling which prohibits the administration of any drug test without probable cause.

## II. ANALYSIS

### A. *The Legal Framework*

The Fourth Amendment protects against "unreasonable searches and seizures" by Government officials in civil as well as criminal contexts. *O'Connor v. Ortega*, — U.S. ——, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987) (plurality opinion); *New Jersey v. T.L.O.*, 469 U.S. 325, 335, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985). To determine whether a given governmental

activity is of the kind that is prohibited by the Fourth Amendment, we must first ask whether the action is a "search," and, if it is, whether it is "unreasonable."

The first inquiry need not detain us long. A "search" is a governmental action that infringes "an expectation of privacy that society is prepared to consider reasonable." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). This court and virtually all others that have passed on the issue have held mandatory urinalysis of public employees to be a "search" which implicates the Fourth Amendment. *See, e.g., National Fed'n of Fed. Employees v. Weinberger*, 818 F.2d 935, 942 (D.C.Cir.1987) (*"NFFE"*); *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 176 (5th Cir.1987); *McDonell v. Hunter*, 809 F.2d 1302, 1307 (8th Cir.1987); *Patchogue–Medford Congress of Teachers v. Board of Educ.*, 70 N.Y.2d 57, 67–68, 510 N.E.2d 325, 329–30, 517 N.Y.S.2d 456, 460–61 (1987).[8] Even if, as in this case, the urine specimen is collected under conditions which do not seriously invade the individual's privacy, *analysis* of the urine permits the Government to inquire into the employee's private life. It is beyond dispute that this constitutes a "search" for purposes of the Fourth Amendment.

While the second inquiry—whether the search is a "reasonable" one—is more difficult, our framework for analysis has been clearly laid out in decisions of the Supreme Court and this court. *See O'Connor*, 107 S.Ct. at 1499; *T.L.O.*, 469 U.S. at 337–43, 105 S.Ct. at 741–45; *NFFE*, 818 F.2d at 942–43. We are required to balance the intrusion on the individual's Fourth Amendment interests, *i.e.*, the privacy expectations which society recognizes as legitimate, against the governmental interest involved, such as the public employer's interest in "the efficient and proper

---

7. Because of this statutory violation, the court found it unnecessary to reach the constitutional due process issue.

8. *But cf. Everett v. Napper*, 825 F.2d 341, 345 (11th Cir.1987) (per curiam), where the court held, without analysis, that there was no "search" when an employee was fired for refusing to submit to urinalysis. Whatever the merit of this view, it is not the case before us.

operation of the workplace." *O'Connor,* 107 S.Ct. at 1502. In striking this balance, we must consider both whether the search was justified at its inception, and whether the search as actually carried out was reasonably related to its objectives and not excessively intrusive. *T.L.O.,* 469 U.S. at 341–42, 105 S.Ct. at 743–44; *NFFE,* 818 F.2d at 943.[9]

B. *The Narrow Question Presented in this Case*

Before applying this framework to the facts of the present case, we think it important to make clear the narrow focus of our inquiry. The only issue in this case is the propriety of the District Court's blanket injunction prohibiting *any* drug testing in the absence of probable cause. The School System does not argue that it can require drug tests absent individualized suspicion outside the context of a regular, employment-related medical examination, and no claim has been raised that the annual physical examination required of Transportation Branch employees is anything but that. Thus, this case focuses solely on drug testing in the context of a regular medical examination for employment purposes; it does not pose the question of what measures the School System could constitutionally take outside this context, *e.g.,* what level of suspicion might be required for random or individualized testing.

Furthermore, the School System has conceded that the EMIT test is not a valid measure of whether the subject is in possession of, is using, or is under the influence of illicit drugs at the time of the test.[10] As this test therefore lacks a sufficient nexus to the appellant's legitimate concern that its employees not possess, use

or be under the influence of drugs while on duty, it is clear that the School System could not constitutionally test its employees for drugs *in the manner Jones was tested,* and our analysis should not be read to suggest the contrary.

Finally, as the School System chose not to appeal that portion of the District Court's injunction ordering the plaintiff reinstated with full backpay and benefits, we have no occasion to consider the legality of possible sanctions for illicit drug use. We do not consider, for example, whether an employee may be automatically discharged in such a case.

C. *Application of the Law to the Facts of this Case*

Having thus delimited the scope of our inquiry, we now apply the balancing test to the facts of this case. We note first that strong privacy interests are involved here. Because drug tests often furnish information about employee activities occurring outside of working hours, such tests may provide Government officials with a periscope through which they can peer into an individual's behavior in her private life, even in her own home. As one court has put it, drug testing is "a form of surveillance," which "reports on a person's off-duty activities just as surely as [if] someone had been present and watching." *Capua v. City of Plainfield,* 643 F.Supp. 1507, 1511 (D.N.J.1986). Moreover, unlike the situation where an employee's office files are searched, a person cannot avoid the intrusion on her privacy associated with compulsory urinalysis "by simply leaving [personal belongings] at home." *O'Con-*

---

9. In balancing these considerations we are mindful that "[u]nder certain circumstances, the Government may deprive public employees of some of the rights they would have as citizens ... [because] sometimes a citizen's full enjoyment of his constitutional rights may be demonstrably incompatible with the mission of the particular public agency employing him." Kamisar, *Drugs, AIDS and the Threat to Privacy,* N.Y. Times, Sept. 13, 1987, § 6 (Magazine), at 109, 110–11; *cf. United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973)

(upholding restrictions on public employees' First Amendment right to engage in political activity); *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (same).

10. Defendants' Admissions 15–17, S.R.E. 16, 21. The EMIT test, which detects metabolites of the chemical THC, associated with marijuana or hashish, "does not indicate when the ingredient was absorbed as THC metabolites may be retained in an individual's system for days or weeks." *Jones v. McKenzie,* 628 F.Supp. at 1503.

*nor,* 107 S.Ct. at 1502.[11] These privacy interests can be outweighed only by strong governmental concerns.

Here there are *serious* safety concerns on the other side of the balance. There can be no doubt whatsoever that the School System's mission of safely transporting handicapped children to and from school cannot be ensured if employees in the Transportation Branch are allowed to work under the influence of illicit drugs. Any suggestion to the contrary would be preposterous. The case law on this point is clear that a governmental concern is particularly compelling when it involves the physical safety of the employees themselves or of others. *See, e.g., Allen v. City of Marietta,* 601 F.Supp. 482 (N.D.Ga.1985) (approving mandatory urinalysis of employees working around high-voltage electric wires, in view of reports of drug use). It is also noteworthy that the safety concern in this case was prompted not only by the nature of the jobs in the Transportation Branch, but also by the strong evidence of a veritable "drug culture" among Transportation Branch employees.[12] It would have been patently irresponsible for school officials to have ignored this situation.

■ The District Court correctly focused on these safety concerns, but it attempted to draw a distinction in this case between bus drivers and mechanics, who might constitutionally be subject to drug testing, and bus attendants, who could not be. 628 F.Supp. at 1508–09. We disagree with this judgment. While the safety concern may be somewhat greater for a school bus driver, it is still quite significant in the case of an employee who is responsible for supervising, attending and carrying handicapped children. For example, the danger to a young, handicapped child, should she be dropped by an attendant or ignored while crossing the street, is obvious. In light of these safety concerns, we find that the School System acted pursuant to a significant and compelling governmental interest in requiring drug testing for Transportation Branch employees as a part of routine employment-related medical examinations.[13]

If the drug testing was thus "justified at its inception," we must also ask "whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place' "—in other words, whether "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive." *T.L.O.,* 469 U.S. at 341–42, 105 S.Ct. at 743–44 (quoting *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)). We note here two significant factors. First, this case involves only testing that is conducted as part of a routine, reasonably required, annual medical examination. This has the effect of ensuring that the intrusion on the employee's privacy is minimized.

Second, under the circumstances of this case, the appellants do not contest that any compulsory drug test employed by the School System, in order to be lawful, must show a nexus to the employer's safety concern. Here, the School System's legitimate justification for the drug testing program

11. Because in this case the intrusion results not merely from the taking of the urine sample, but from the information its analysis yields, this intrusion is not lessened by the fact that the employees were allowed to produce their urine specimens in the privacy of a restroom. Requiring that the specimen be produced under some form of observation would obviously raise different privacy concerns, which we do not address here.

12. The estimate that 60% of Branch employees were using drugs may have been exaggerated, *see* French Deposition, S.R.E. 127, but even a smaller figure could be indicative of a serious drug problem.

13. We emphasize that our concern is for the physical safety of the students. We need not address the argument advanced by the appellants that drug testing could be justified by concerns about the children's emotional needs during the lengthy bus trips. *See* Brief for Appellants at 3 & n. 5, 19–20. Neither do we address the situation raised in *Patchogue–Medford Congress of Teachers, supra,* in which the New York Court of Appeals held that mandatory drug testing of public school *teachers* is unconstitutional. We offer no view on the holding in *Patchogue–Medford* because it raises questions that are beyond the bounds of the issues before us.

is its concern that employees involved in the transportation of handicapped children not be under the influence of drugs while on duty. The School System made clear that its purpose in ordering the drug testing was to enforce Superintendent's Directive 662.13, which prohibits employees from being "under the influence of ... drugs ... while on school premises." The appellants no longer claim that the EMIT test is a valid measure of whether an employee has used or been under the influence of drugs "while on school premises," so the test administered to the appellee is no longer in issue. The only point left to be made in this case—and the appellants do not appear to challenge it—is that any drug test the School System employs in the future must be one that validly detects the activity with which the School System is legitimately concerned.

## CONCLUSION

In summary, then, we hold that it is not unreasonable for the School System to require drug testing of its employees where: (a) the employees' duties have a direct impact on the physical safety of young school children; (b) the testing is conducted as part of a routine, reasonably required, employment-related medical examination; and (c) the test employed is one that has a nexus to the employer's legitimate safety concern.

For these reasons we reverse the District Court's judgment pertaining to "probable cause," and vacate that portion of its injunction from which appeal was taken.