**OWNER–OPERATORS INDEPENDENT DRIVERS ASSOCIATION OF AMERICA, INC., a corporation, and Michael York, an individual, Plaintiffs,**

v.

**James H. BURNLEY, Secretary of Transportation, and United States Department of Transportation, Federal Highway Administration, Defendants.**

**No. C–88–4547 MHP.**

United States District Court, N.D. California.

Jan. 6, 1989.

Jeffrey W. King, K. Michael O'Connell, Daniel J. Harrold, Collier, Shannon, Rill & Scott, Washington, D.C., Michael F. Healy, Michael G. Ornstil, William P. Keane, Sedgwick, Detert, Moran & Arnold, San Francisco, Cal., for plaintiffs.

John R. Bolton, Asst. Atty. Gen., Mary E. Goetten, Brian G. Kennedy, Attys., Dept. of Justice, Civ. Div., Washington, D.C., Joseph P. Russoniello, U.S. Atty., George Christopher Stoll, Asst. U.S. Atty., San Francisco, Cal., for defendants.

## MEMORANDUM AND ORDER

PATEL, District Judge.

Fed.R.Civ.P. 65(a)

Plaintiffs, an association of independent owner-operators of motor vehicles and an individual owner-operator, Michael York, seek a preliminary injunction pursuant to 28 U.S.C. § 2202 and Federal Rule of Civil Procedure 65(a) which would prevent the Secretary of Transportation and other government officials from implementing regulations requiring drug testing of drivers of commercial vehicles. On December 21, 1988, the court issued a temporary restraining order which stayed the implemen-

tation of the random drug testing and the post-accident testing regulations (insofar as post-accident testing would be conducted without reason to believe that the truck driver was at fault or using drugs at the time of the accident). In addition, the court requested the parties to submit additional briefing, particularly with regard to the evidence supporting the adoption of the regulations.

The hearing on the motion for a preliminary injunction was held on December 30, 1988, and at that time, the court indicated its intention to enjoin implementation of that portion of the regulations covering the random drug testing and post-accident testing in substantial accordance with the terms of its temporary restraining order. The parties agreed that the temporary restraining order would remain in effect until the court issued the order granting the preliminary injunction. Having considered the papers submitted and the arguments of the parties, for the following reasons, the court now grants the plaintiffs' motion for a preliminary injunction as to the random drug testing regulations and post-accident testing as discussed below. The court's order issuing a temporary restraining order is incorporated by reference and attached herein as Appendix A.

## BACKGROUND

The facts have been detailed in the court's temporary restraining order issued December 21, 1988, and therefore are not repeated here.

## LEGAL STANDARD

Ninth Circuit law requires that a party moving for issuance of a preliminary injunction must demonstrate either "1) a combination of probable success on the merits and the possibility of irreparable harm, or 2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor." *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir.1987). In the instant case, the court applies the traditional standard for the granting of preliminary relief, namely that the moving party must show probable success on the merits and the possibility of irreparable harm.

## DISCUSSION

### I. *Irreparable Harm*

In its papers and initial argument, the government argued that the regulations were not ripe for judicial review. At the hearing on the motion for a preliminary injunction, however, the government acknowledged that the case was ripe for review within the meaning of *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1516, 18 L.Ed.2d 681 (1967) (ripeness turns on "fitness for judicial decision and hardship to parties of withholding court consideration.") As in *Abbott Laboratories*, the issues presented in the instant case are legal ones and the challenged regulations constitute "final agency action" within the meaning of section 10 of the Administrative Procedure Act, 5 U.S.C. § 704. *Id.* at 149–150, 87 S.Ct. at 1515–16.

With the elimination of the ripeness issue, the government's arguments concerning the timeliness of the motion for a preliminary injunction bear only upon the issue of irreparable injury. As discussed in the order granting the temporary restraining order, the court finds, notwithstanding the government's arguments, that the random drug testing and post-accident drug testing regulations could have a severe and immediate impact upon the livelihood of millions of drivers. Although carriers are not required to implement the drug testing program until December of 1989 or 1990, depending upon their size, the government admits that nothing in the regulations forbids employers from implementing the programs on the effective date of the regulations, December 21, 1988.

Immediate injury is also possible from post-accident drug testing, despite the government's position that such activity need not actually occur until December 21, 1989. Plaintiffs' Memo, Ex. B to Keane Dec. (letter from Brian Kennedy, Justice Department, to K. Michael O'Connell). The regulations demand that drivers, not carriers, initiate post-accident testing, and there is no indication in the regulations that the status of the driver's employer(s) would determine the date post-accident testing was implemented. *See* 53 *Fed.Reg.* 47,154

(1988) (regulations to be codified at 49 C.F.R. §§ 391.113, 391.115, 391.117). The rules specify that within 32 hours after a reportable accident the driver must undergo drug testing. *Id.* (regulation to be codified at 49 C.F.R. § 391.113). Furthermore, drivers who test positive will be subject to sanctions, so the possibility of immediate harm exists. *Id.* (regulation to be codified at 49 C.F.R. § 391.117.)

The regulations also have the potential to inflict severe injury. Under the disqualification provisions, drivers stand to lose their right to operate a truck on the interstate highways if they test positive or refuse to take the test. Additionally, even if they do not begin to test drivers immediately, members of the plaintiff association must commence preparations for the expensive and elaborate system of drug testing. The court therefore finds that plaintiffs have demonstrated that the random testing and post-accident testing regulations threaten immediate and irreparable injury.

## II. *Probability of Success on the Merits*

As discussed in the court's temporary restraining order, plaintiffs have not shown they are likely to prevail on the claims that the pre-employment testing, periodic testing and "reasonable suspicion" testing violate their Fourth Amendment rights.[1] On the other hand, the court finds that plaintiffs have demonstrated that they are likely to prevail on the merits with respect to the random drug testing regulations and to post-accident testing insofar as the latter is conducted without reasonable suspicion that the driver was using drugs or was at fault.

The central question is whether the random drug testing and post-accident testing qualify as reasonable administrative searches under Fourth Amendment jurisprudence.[2] The court must inquire whether the search "was justified at its inception" and "whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place' ". *Railway Labor Executives' Ass'n v. Burnley*, 839 F.2d 575, 587 (9th Cir.), *cert. granted,* —— U.S. ——, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988) (quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 341, 105 S.Ct. 733, 743, 83 L.Ed.2d 720 (1985)).

The court asked the government to provide further information on the justification for the regulations in order to evaluate whether the programs were tailored to fit the circumstances. Yet the government has produced little, if any, substantive evidence to support the intrusive searches contemplated by random drug testing and indiscriminate post-accident testing.[3]

1. At the hearing on plaintiffs' motion for a preliminary injunction, counsel for the plaintiffs argued that "reasonable suspicion" testing should be enjoined because the regulations provide for no review of employers' actions in this regard. On their face, however, regulations concerning "reasonable suspicion" do not present a constitutional defect. A challenge to the "reasonable suspicion" testing program as it will be applied is premature at this stage, since plaintiffs cite no record of abuse or misconduct.

2. For discussion of the administrative search doctrine, *see* TRO Order at 5–6.

3. When the regulations were first proposed in June 1988, the Federal Highway Administration noted that "Data concerning drug-involved highway accidents and drug use among truck and bus drivers are scarce." 53 *Fed.Reg* 22,270 (1988) (background to proposed rules).

The government nonetheless cites *Costner v. United States,* 720 F.2d 539 (8th Cir.1983) for the proposition that the Department of Transportation may mandate administrative searches even where the regulated health condition is not rampant. The plaintiff in *Costner* challenged regulations forbidding persons with a history of epilepsy from driving trucks in interstate commerce. The plaintiff had driven for approximately fifteen years without having an accident and had not had a epileptic seizure for twenty years. The Eighth Circuit rejected the plaintiff's contention that the agency rules violated the equal protection component of the due process clause of the Fifth Amendment and the overbreadth doctrine. *Id.* at 540–542.

*Costner* is easily distinguishable from the case at bar. First, the claims in *Costner* involved an equal protection challenge, not a Fourth Amendment search and seizure. Second, the government there cited numerous studies showing that a less onerous rule would not be feasible to implement the purposes of the regulations. Third, the prophylactic rule at issue in *Costner* closely resembled existing rules against drug usage, not the more intrusive ones proposed under the regulations at issue here. *Costner* did not deal with searches and indiscrimi-

The government's primary evidence supporting the regulations is the Lund study, conducted for the Insurance Institute for Highway Safety. A. Lund et al., *Drug Use by Tractor–Trailer Drivers*, 33 J. of Forensic Sci. 648 (1988), attached as Ex. E to Defendants' Supplemental Memo. Published in May 1988, the Lund study "provided the *first* objective data regarding the use of potentially abusive drugs by tractor-trailer drivers." *Id.* at 660 (emphasis added). In that survey blood or urine samples or both were obtained from 317 of 359 randomly selected tractor-trailer drivers. Participants were asked to take part in a health survey at a truck weighing station on Interstate 40 in Tennessee.

By the authors' own admission, the Lund survey is plagued by design and implementation problems. First, the study probably underestimates the use of prescription medicines. Second, the Lund study solicited volunteers and encountered a high rate of refusal to undergo testing, so its results may be biased. Third, since the study looked only at drivers at one truck stop, the results may not be representative of drivers nationwide.[4] As the study concludes, "drug incidence among other truck-driver populations are unknown and may be higher or lower than reported here." *Id.* Finally, the Lund study's figures on drug use do not establish impairment of the drivers "because of the complex relationship between performance and drug concentrations." *Id.* at 648.

In addition to the Lund study, the government submitted testimony and comments from various motor carrier executives and employers. Such evidence can be given only minimal weight, because of such problems as anecdotal discussion and the absence of supportive data, lack of control groups, and dubious interpretations of existing data. For example, the government cites the testimony of one Texas businessman who stated at a public hearing that his random drug testing program discovered that 30 percent of his employees had engaged in some form of drug use. Defendants' Supplemental Memo, Ex. F at 14. However, that drug testing effort did not focus on truck drivers, but included all employees, as well as management. The results apparently showed little use of cocaine or amphetamines among the employees. *Id.* Furthermore, post-accident testing within 24 hours did not show the presence of drugs on a single driver. *Id.* at 27–28.

The comments of the Texas businessman reveal the weaknesses of the government's evidence. Many employers whose comments are offered by the government tested all employees, not simply drivers. *See, e.g.*, Defendants' Supplemental Memo, Ex. G at 15–16 (Burlington Northern Railroad); Ex. J at 1–2 (Leaseway Transportation). Their results derived from a variety of drug testing programs including pre-employment testing and for-cause testing. *See, e.g.*, Defendants' Supplemental Memo, Ex. G at 16 (Burlington Northern reported drop in positive drug tests from 15.4% to 4.7% following institution of pre-employment and for-cause testing); Ex. J at 2 (Leaseway Transportation found 18% positive drug tests in pre-employment testing; periodic testing produced 5% positive tests); Ex. L at 29 (Teamsters' program provides for pre-employment, periodic and probable suspicion testing; recent figures indicate 0.2% of drivers tested positive for drugs on biennial physical examination). Pre-employment screening samples a different population than employed drivers, so the results from one group may not be imputed to another. Simply put, the testimony of

---

nate post-accident testing. It involved persons who actually suffered from epilepsy, not searches to detect epilepsy. There is no question that under current regulations persons who use drugs may be barred from operating trucks on interstate highways. This case, however, concerns *testing* for drug usage.

**4.** In addition to criticizing the study for the high refusal rate of those asked to participate, the

Transportation Research Board, an arm of the National Academy of Sciences has commented that: "The other weakness ... is that [the Lund study] is simply a case study and not necessarily a random sample of drivers." Transportation Research Board, *Zero Alcohol and Other Options: Limits for Truck and Bus Drivers* 26 (1987), attached at Plaintiffs' Memo, Ex. C.

various employers lacks the scientific and empirical reliability to justify the government's sweeping action.

Evidentiary support for indiscriminate post-accident testing is similarly lacking. The United States Department of Transportation has never categorized drug usage as a cause of accident in its post-accident reporting, apparently because the incidence of drug involvement in accidents is negligible.[5] Defendants' Supplemental Memo, Ex. F at 51 (testimony of Robert Musgraves, Vice President, Steere Tank Lines). A study undertaken by the University of Michigan Transportation Research Institute for the American Automobile Association Foundation found that in accidents involving automobiles and tractor-trailers, the auto driver had been at fault three times as frequently as the truck driver. *Id.*

As discussed above, the regulations providing for random drug testing and indiscriminate post-accident drug testing lack the particularized, reliable findings about drug use or impairment in the industry necessary to justify the intrusiveness of the search.[6] *Compare Jones v. McKenzie,* 833 F.2d 335, 339–341 (D.C.Cir.1987) (upholding routine testing of school bus drivers where record showed rampant drug usage, but where random testing was not employed). While the court shares the government's concern with eliminating drug usage, rhetoric alone cannot serve as the basis for the invasion of constitutionally protected rights.

## CONCLUSION

On the record presented, plaintiffs have shown that they are likely to prevail on the merits on the claims that random drug testing and indiscriminate post-accident testing under the regulations are unconstitutional under the Fourth Amendment. Plaintiffs have also demonstrated that they are likely to suffer irreparable injury if they are denied immediate relief from the effect of these regulations.

IT IS HEREBY ORDERED that this court preliminarily enjoins and stays implementation of any and all of those portions of the new regulations pertaining to random drug testing and post-accident drug testing, which have been published at 53 Fed.Reg. 47153–54 (1988), and are to be codified at 49 C.F.R. §§ 391.109, 391.111, 391.113, 391.115, 391.117, and in other parts of 49 C.F.R. 391 and 494, with the exception that post-accident testing under these regulations is allowed where there is any reasonable suspicion of drug usage, or reasonable cause to believe a driver has been operating a vehicle while under the influence of those drugs enumerated in 49 C.F.R. Ch. III, Schedule I, or reasonable cause to believe the driver was at fault in the accident and drug usage may have been a factor.

The court further notes that there has been a full hearing on the merits and no further evidence is likely to be developed at a hearing for a permanent injunction. Therefore, the parties may stipulate to an entry of this order as a permanent injunction without any waiver of the non-prevailing party's right to appeal.

IT IS SO ORDERED.

### APPENDIX A

*MEMORANDUM AND ORDER GRANTING TEMPORARY RESTRAINING ORDER*

Fed.R.Civ.P. 65(b)

Plaintiffs, an association of independent owner-operators of motor vehicles and an

---

5. Commentary to the final regulations states that post-accident drug testing "will provide a valuable source of information about the relationship of controlled substance use and motor carrier accidents." 53 *Fed.Reg* 47,140 (1988). The mere collection of data cannot justify the intrusive search contemplated by indiscriminate post-accident testing.

6. The only record of random drug testing cited by the government is the Coast Guard experience, where the percentage of military personnel testing positive for some form of drug usage has declined from 10.3% in 1983 to 2.9% in 1987. Defendants' Supplemental Memo, Ex. L at 6 (testimony of Robert Farris, Federal Highway Administrator). This evidence does not bear upon the regulations at issue, since the government has not even attempted to show that Coast Guard personnel and truck drivers are analogous populations or face similar conditions in the workplace.

individual owner-operator, Michael York, seek a preliminary injunction pursuant to 28 U.S.C. § 2202 and Federal Rule of Civil Procedure 65(a) which would prevent the Secretary of Transportation and other government officials from implementing regulations requiring drug testing of drivers of commercial vehicles. Upon consideration of the papers filed and arguments heard on December 19, 1988, the court, without prejudice, declines to grant a preliminary injunction at this time. Pursuant to Federal Rule of Civil Procedure 65(b), the court issues a temporary restraining order as to the random drug testing and post-accident testing regulations. The restraining order shall remain in effect until further order of this court. Further hearing on the plaintiffs' motion for a preliminary injunction will be held on December 30, 1988, at 10:30 a.m., unless the parties stipulate to a later time for a hearing.

## BACKGROUND

Plaintiffs challenge regulations issued by the Department of Transportation mandating various forms of drug testing of motor vehicle drivers. The regulations are scheduled to become effective on December 21, 1988. The final rule is published at 53 Fed.Reg. 47,134 et seq. (1988) and will be codified at various parts of 49 C.F.R. §§ 391 and 494. The new regulations are aimed at "detect[ing] and deter[ring] the use of controlled substances" including marijuana, cocaine, opiates, amphetamines and phencyclidine (PCP). 53 Fed.Reg. 47,-151 (to be codified at 49 C.F.R. 391.81(b)). Five different forms of drug testing are required by the new regulations: "reasonable cause" testing, pre-employment testing, periodic (biennial) testing, random testing, and post-accident testing. Under the regulations, motor carriers are responsible for implementing these various provisions. Large carriers (50 or more truckers) must implement a satisfactory program of drug tests by December 21, 1989; smaller carriers (fewer than 50 truckers) must implement the measures by December 21, 1990. It is estimated that more than 3 million drivers will be subject to these new regulations. Among other claims, plaintiffs contend that the regulations violate their rights under the Fourth Amendment to the United States Constitution by authorizing bodily searches without the issuance of a warrant.

## LEGAL STANDARD

A temporary restraining order preserves the status quo pending the ultimate outcome of litigation where the parties raise serious questions and there is the possibility of irreparable harm. In considering plaintiffs' motion, the court is guided by the standards governing the issuance of preliminary injunctions. Ninth Circuit law requires that a party moving for issuance of a preliminary injunction must demonstrate either "1) a combination of probable success on the merits and the possibility of irreparable harm, or 2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor." *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir.1987). These tests are not unrelated, but represent the opposite ends of a "continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *Id.* (citation omitted).

## DISCUSSION

### I. *Ripeness*

The parties fundamentally disagree on the ripeness of this case for resolution. The government asserts that the regulations cannot be reviewed until December 21, 1989, the date testing must begin, although counsel for the government admitted at the hearing that motor carriers could begin testing under the aegis of the regulations as early as midnight of December 21, 1988. Plaintiffs contend that there is a significant possibility of immediate testing. In particular, plaintiffs assert that post-accident testing must begin immediately since the rules specify that within 32 hours after a reportable accident the driver must undergo drug testing. *See* 53 Fed.Reg. 47,154 (1988) (to be codified at 49 C.F.R. § 391.113). A rational interpretation of the regulations implies that post-accident testing and sanctions will apply immediately. Given the absence of documentation by the government to rebut such fears, this court

treats plaintiffs' claims as ripe for resolution insofar as plaintiffs allege that the new regulations are facially invalid. Furthermore, it is undisputed that costly, elaborate mechanisms for putting random tests into place must be commenced by members of the plaintiff association in order to meet the December 1989 compliance order.

## II. Substantive Questions Presented

Under existing regulations, drivers are disqualified for the use of drugs. 49 C.F.R. § 391.41(b)(12) (1987). Current regulations provide that drivers must submit to a physical examination both before obtaining employment and biennially thereafter. 49 C.F.R. § 391.41(a) (1987); 391.45(b) (1987). This examination includes urinalysis to determine whether a person has infections of the urinary tract or diabetes, or whether there are "other findings indicative of health conditions likely to interfere with the control and safe operations of a motor vehicle." Id. § 391.43, Instructions at 435.

With this factual background in mind, the court considers this challenge under the Fourth Amendment and looks to the standards for warrantless searches.[1] To establish a violation of the Fourth Amendment, plaintiffs first must show that there is sufficient state action to invoke constitutional protection. Once this is established, the government may defend by showing that the search fits within the administrative search exception to the warrant requirement, which allows warrantless searches of pervasively regulated industries.[2] Finally, the government must demonstrate that the search is reasonable. See, e.g., Railway Labor Executives' Ass'n (RLEA) v. Burnley, 839 F.2d 575, 580–89 (9th Cir.), cert. granted, —— U.S. ——, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988).

Sufficient state action is involved here, since the federal government has required that motor carriers begin testing their employees for the presence of drugs. See, e.g., RLEA v. Burnley, 839 F.2d at 582 (governmental role in drug testing satisfied Fourth Amendment requirements). From the record presented, it is also clear that the trucking industry is pervasively regulated, and that the new regulations can be considered administrative searches.

To withstand constitutional scrutiny, an administrative search must be justified at the outset, and must be "reasonably related in scope to the circumstances which justified the interference in the first place." RLEA v. Burnley, 839 F.2d at 587. With regard to three types of drug testing—"reasonable suspicion" testing, pre-employment testing, and biennial testing—plaintiffs have failed to raise serious questions of constitutionality. These types of tests have been consistently upheld as reasonable Fourth Amendment searches. See, e.g., Jones v. McKenzie, 833 F.2d 335, 341 (D.C.Cir.1987) (allowing drug testing of school bus drivers as part of routine medical examinations); National Treasury Employees Union v. Von Raab, 816 F.2d 170, 182 (5th Cir.), cert. granted, —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988) (allowing mandatory drug testing for customs agents seeking transfers to sensitive jobs); American Fed'n. of Gov't. Employees, Council 33 v. Meese, 688 F.Supp. 547, 556 (N.D.Cal.1988) (permitting testing of Bureau of Prisons employees where reasonable suspicion exists that drug use impairs individual's job performance); Nat'l Treasury Employees Union v. Lyng, 706 F.Supp. 934, 950 & n. 59 (D.D.C.1988) (order granting preliminary injunction) (allowing

---

**1.** For the purposes of a temporary restraining order, the court declines to consider the other grounds advanced by plaintiffs. Any constitutional right to privacy claims are simply not ripe for adjudication. See Railway Labor Executives Ass'n v. Burnley (RLEA) v. Burnley, 839 F.2d 575, 592 (9th Cir.) (right to privacy claims should be litigated after confidentiality has been breached), cert. granted, —— U.S. ——, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988). The claims that the Secretary exceeded his statutory authority and that he violated the Regulatory Flexibility

Act, 5 U.S.C. § 601 et seq., need not be reached at this stage of the proceedings.

**2.** For example, in Shoemaker v. Handel, 795 F.2d 1136, 1142 (3rd Cir.), cert. denied, 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986), the Third Circuit held that drug testing of horse jockeys was justified since the horse racing industry was heavily regulated by the state and since persons "engaged in the regulatory activity are the principal regulatory concern." Id.

agency-wide "reasonable suspicion" testing of Department of Agriculture employees).

As to post-accident testing and random testing, on the other hand, plaintiffs raise serious questions regarding the constitutionality of the procedures. The government has cited only two studies, each having dubious merit and weight, to justify the intrusive testing contemplated by both random testing and some post-accident testing. Unlike the routine testing of bus drivers upheld in *Jones v. McKenzie*, 833 F.2d 335, 336 (D.C.Cir.1987), these regulations are not supported by particularized, reliable findings about rampant drug usage in the industry in question. In addition, the court notes that despite the undisputed drug problems and compelling reasons cited in *Jones*, random testing was not employed in that program. *See* 833 F.2d at 337 (employees notified before testing). From the record presented, the government has not established a reasonable relation between post-accident or random testing and the governmental goal of eradicating the use of drugs in the workplace.[3] Random testing under the new regulations lacks the requisite element of individualized suspicion. *See, e.g., RLEA v. Burnley*, 839 F.2d at 587 (particularized suspicion necessary for drug testing of railroad employees). Nor does the record reveal the presence of widespread drug use by the truckers. Similarly, the program of post-accident testing, as presented in the regulations, does not require any indication that the driver contributed to the accident.

Balanced against this meager record are the interests of the plaintiffs and the drivers they seek to represent. The court is persuaded that the balance of hardships tips sharply in plaintiffs' favor. After a reportable accident, a driver who has a positive test result or refuses to take the test will be disqualified from driving for one year. 53 Fed.Reg. 47,154 (to be codified at 49 C.F.R. § 391.117). It appears that a driver who tests positive in a random testing program under the regulations also will be disqualified from employment. The government is not convincing or fully certain that the impact of the regulations will not be immediate. These regulations thus threaten to inflict serious harm on the ability of millions of drivers to earn their livelihood. By contrast, there is no showing that the issuance of a temporary restraining order will create hardship for the government.

CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED that this court enjoins and stays implementation of any and all of those portions of the new regulations pertaining to random drug testing and post-accident drug testing, which have been published at 53 Fed.Reg. 47153–54, and are to be codified at 49 C.F.R. §§ 391.109, 391.111, 391.113, 391.115, 391.-117, and in other parts of 49 C.F.R. 391 and 494.

IT IS FURTHER ORDERED that post-accident testing under these regulations is enjoined except insofar as there is any reasonable suspicion of drug usage, or reasonable cause to believe a driver has been operating a vehicle while under the influence of those drugs enumerated in 49 C.F.R. Ch. III, Schedule I, or reasonable cause to believe the driver was at fault in the accident and drug usage may have been a factor.

IT IS FURTHER ORDERED that the parties shall submit briefs not longer than 10 (ten) pages of text to respond to this court's questions propounded at the hearing on December 19, 1988, particularly with regard to documentation supporting the adoption of the testing regulations. The government's submission shall be filed with the court and delivered to plaintiffs no later than December 27, 1988, at 12 p.m. (noon). Plaintiffs' response shall be filed

---

**3.** The court does not minimize the difficulty encountered by those who wish to test for the use of controlled substances, as opposed to alcohol use. The court recognizes that the person using controlled substances may lack the out-ward physical signs common when a person has been under the influence of alcohol. Development of the record in this area can be pursued at the preliminary injunction or subsequent stages of the litigation.

with the court and delivered to the government no later than December 29, 1988, at 12 p.m. (noon).

IT IS FURTHER ORDERED that the parties shall appear in this court on December 30, 1988, at 10:30 a.m., for the purpose of further hearing on plaintiffs' motion for a preliminary injunction, unless the parties stipulate to a later time for the hearing, in which case the briefing schedule will be changed accordingly.

IT IS SO ORDERED.

Dated: Dec. 21, 1988

/s/ Marilyn Hall Patel
MARILYN HALL PATEL
United States District Judge