**UNITED STATES COURT OF APPEALS**
**Office of the Clerk**
**Byron White United States Courthouse**
**1823 Stout Street**
**Denver, CO 80257**

**Patrick Fisher**                                    **Elisabeth Shumaker**
**Clerk**                                             **Chief Deputy Clerk**

February 28, 1996


To: ALL RECIPIENTS OF THE CAPTIONED OPINION

Re: 95-2003, Rutherford v. City of Albuquerque
    Filed February 23, 1996, by Judge Coffin


        Please be advised of the folowing correction to the
captioned decision:

        Page 1, within the paragraph for the counsel for the
defendants-appellees, the City of Albuquerque is incorrectly listed
as Aluquerque.

        Page 16, third paragraph, third line, the reference to
(10th Cir. Jan. xx, 1996) should read (10th Cir. Jan 17, 1996).

        Please make these corrections to your copy.



                                    Very truly yours,

                                    Patrick Fisher,
                                    Clerk


                                    By:

                                    Barbara Schermerhorn
                                    Deputy Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

**Filed 2/23/96**

TENTH CIRCUIT
_____

JERRY RUTHERFORD,                      )
                                       )
        Plaintiff-Appellant,           )
                                       )
v.                                     )      No. 95-2003
                                       )
ALBUQUERQUE, CITY OF; LOUIS E.         )
SAAVEDRA, Mayor, ARTHUR BLUMENFELD,    )
Chief Administrative Officer; JACK     )
BURKHARD, JULIE GARCIA, MYRA           )
GUTIERREZ, MARYANNE OLLER, individually )
and in their official capacities;      )
ALBUQUERQUE PARKING/TRANSIT DEPARTMENT; )
CITY OF ALBUQUERQUE EMPLOYEE HEALTH     )
CENTER,                                )
                                       )
        Defendants-Appellees.          )
_____

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-91-1235-JB)
_____

Paul Livingston, Albuquerque, New Mexico, for Plaintiff-Appellant.
Victor S. Lopez, Assistant City Attorney, Albuquerque, New Mexico
(Robert M. White, City Attorney, and Judy K. Kelley, Assistant City
Attorney, on the brief), for Defendants-Appellees.
_____

Before SEYMOUR, COFFIN,[1] and McKAY.
_____

    COFFIN, Senior Circuit Judge. Appellant Jerry Rutherford was

fired from his job with the City of Albuquerque because of a

positive drug test. His challenge to the testing on due process

and Fourth Amendment grounds was rejected by the district court,

_____

    [1]The Honorable Frank M. Coffin, United States Senior Circuit
Judge for the First Circuit, sitting by designation.

-2-

which granted summary judgment for the City on both claims. We affirm the court's ruling on the due process claim, but conclude that the circumstances surrounding Rutherford's testing constituted an unreasonable search in violation of the Fourth Amendment.

## I. Factual Background[2]

Rutherford began working for the City of Albuquerque as a bus driver in April 1980. In April 1990, as a result of back problems that followed a work-related accident and a subsequent heart attack, he was placed into physical layoff status. He remained out of work until April 1991, when a doctor determined that he was fit to resume employment.

Rutherford was scheduled to return to work on Monday, April 15, as a truck driver in the Public Works Department. He was sent first to the Employee Health Center for a medical examination, including a urinalysis to test for drugs. The test revealed the presence of marijuana metabolites, indicating recent exposure to the drug. Rutherford admitted in his deposition that he had smoked marijuana a week or two before the test.

The drug test had been given to Rutherford pursuant to city policy adopted earlier in 1991. The policy, set out in Administrative Instruction Nos. 121 and 123, provided for drug testing in several specific situations, including testing as a prerequisite to obtaining a city operator's permit. Such a permit is required for the truck driving position Rutherford was to fill.

---

[2] Unless otherwise noted, the facts are not significantly in dispute.

The City also requires drug testing as a condition of beginning employment.  In the district court and in its appellate brief, the City maintained that Rutherford was tested because he needed an operator's permit; at oral argument, the City's counsel acknowledged that Rutherford had such a permit and asserted that he was tested as a "new hire" because of his new position.[3]

The substance abuse policy required termination for any employee in Rutherford's position who tested positive for drugs and, following his positive result, Rutherford was fired.  He received both a pre-termination hearing and a full evidentiary hearing following his discharge on May 3.  The personnel hearing officer upheld the firing, and the City Personnel Board unanimously adopted the officer's recommendation.

Rutherford thereafter brought this action, claiming that he was denied procedural due process and that the mandatory drug test violated his Fourth Amendment right to be free from unreasonable searches and seizures.  Defendants moved for summary judgment on both claims, and Rutherford also moved for summary judgment on the Fourth Amendment claim.  In rejecting the due process claim, the district court noted that Rutherford was given the opportunity to challenge the validity of his drug test at all stages of the administrative proceedings and therefore concluded that Rutherford was provided "all the process he was due."  On the Fourth Amendment

---

[3]  The policy also requires testing based upon reasonable suspicion and following self-referral to the Employee Assistance Program.

-4-

claim, the court canvassed the precedent on the constitutionality of mandatory drug testing of public employees and determined that "the City's compelling interest in reducing the risk of drug-related accidents among drivers of vehicles weighing over 26,000 pounds outweighs Plaintiff's privacy expectations."

In this appeal, Rutherford challenges each of those determinations.

## II. Fourth Amendment

It is well established that a urinalysis required by a government employer for the purpose of detecting illegal drug use is a search protected by the Fourth Amendment. See Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 617-18 (1989); National Treasury Employees Union v. Von Raab, 489 U.S. 656, 678-79 (1989); Saavedra v. City of Albuquerque, slip op. at  (10th Cir. Jan.  1996). The Fourth Amendment, however, does not proscribe all searches; it bars only unreasonable ones.

> What is reasonable, of course, "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." . . . Thus, the permissibility of a particular practice "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."

Skinner, 489 U.S. at 619 (citations omitted).

In the two leading Supreme Court employee drug testing cases, Skinner and Von Raab, the justices concluded that the testing at issue was permissible without the usual protection of a warrant based on probable cause, and even without "any measure of individualized suspicion," 489 U.S. at 668. See also id. at 633.

-5-

In Skinner, the Court ruled that railroad employees' privacy expectations, which were limited because of the industry's pervasive regulation, were outweighed by the government's compelling interest in ensuring the safe operation of the rails. In Von Raab, the Court similarly found that the government's interests in safety and the integrity of its borders outweighed the individual privacy interests of customs officials who carry firearms or are involved in drug interdiction.[4]

The City argues that the balancing here leads to the same result. Because Rutherford's new job required him to drive a 26,000-pound truck, whose mishandling could cause serious and substantial injury or other harm, his position is classified as "safety sensitive" by the City and he is required to submit to drug testing. The City contends that the privacy interests of "safety sensitive" employees such as Rutherford unquestionably must give way to the City's need to assure their sobriety and, ultimately, to ensure the safety of the general public and the employees themselves. In agreeing with the City, the district court heavily relied on a Ninth Circuit decision validating mandatory drug testing of commercial truck drivers whose vehicles are comparable in weight to Rutherford's. See International Broth. of Teamsters v. Department of Transp., 932 F.2d 1292, 1304 (9th Cir. 1991) ("A 26,000 pound truck . . . `becomes lethal when operated negligently

---

[4] The Court withheld judgment, however, on the reasonableness of testing employees solely because they handled classified material, remanding for further development of the record on that issue. 489 U.S. at 677-78.

by persons who are under the influence of . . . drugs.'") (citation omitted).

Rutherford responds in two ways.  First, he argues that city truck drivers such as himself are inappropriately classified as "safety sensitive"; hence, the City may not subject him to mandatory, suspicionless drug testing.  He rejects the City's comparison to the Ninth Circuit's <u>Teamsters</u> case, and asserts that significant differences exist between the long-distance truckers at issue there and city dump truck drivers like himself. [5] Rutherford's second response is narrower. Whatever the validity of suspicionless drug testing for heavy truck drivers generally, he claims that the City unfairly implemented its policy in the particular circumstances of this case.  Because we find merit in this latter complaint, we decline to reach the broader question.

We therefore accept for the moment the City's assertion that Rutherford's job properly was designated as safety sensitive, and that he may be subject to mandatory drug testing even in the absence of reasonable suspicion.  The question that remains is whether the specific procedures used here and the intrusion on privacy they caused were reasonable.  <u>See</u> <u>Taylor</u> v. <u>O'Grady</u>, 888

---

[5] Although not based on record evidence, he asserts that over-the-road truckers often work many miles from their home office and supervisors, while city employees report each day to the same location and seldom are far from their supervisors, rendering day-to-day scrutiny more feasible.  In addition, he notes that city drivers frequently interact with their crews and colleagues, and direct observation of them is therefore possible.  In addition, he points out that the trucking industry is closely regulated, and the drivers' privacy expectations consequently are more limited.

F.2d 1189, 1195 (7th Cir. 1989) ("[W]hile urinalysis may be within the government's prerogative in a given circumstance, the manner in which the program is carried out may be so unnecessarily intrusive as to render it constitutionally intolerable.")

Rutherford points to several aspects of his testing that distance it from cases, such as Skinner and Von Raab, in which courts have upheld drug tests. First, he notes that neither of the provisions of the substance abuse policy invoked by the City expressly applied to him at the time he returned to work. Because he already had a city operator's license, the provision requiring a test as a prerequisite to such licensing facially was inapplicable. The policy states that a city employee who has a license will be tested at the time of license renewal, which, in Rutherford's case, had not yet arrived. In addition, because he was not an applicant seeking employment with the City for the first time, but instead was a city employee returning to work after a medical absence, he asserts that the provision for pre-employment testing also was inapplicable.[6] Cf. Laverpool, et al. v. New York City Transit Auth., 835 F. Supp. 1440, 1456 (E.D.N.Y. 1993), aff'd, 41 F.3d 1501 (2d Cir. 1994) (policy provided for drug testing of safety sensitive employees when "they return to work after an extended absence of suspension"). He emphasizes, as well, that he

_____

[6] At argument, the City contended that it was routine practice to test employees who were transferred to new positions. The Administrative Instructions do not, by their terms, contemplate such testing, and we found no support in the record for the statement that it nevertheless was commonplace.

was not told that he would be tested until he came to work on April 15.[7]

Rutherford maintains, and we agree, that the circumstances surrounding his urinalysis resulted in a substantially more intrusive search than those upheld by the Supreme Court in Skinner and Von Raab. In both of those cases, the Court observed that "the circumstances justifying toxicological testing and the permissible limits of such intrusions are defined narrowly and specifically in the regulations that authorize them," Skinner, 489 U.S. at 622; Von Raab, id. at 667. Thus, because "minimal discretion [was] vested in those charged with administering the program," a search warrant authorized by a neutral magistrate was less crucial than in other Fourth Amendment contexts. Skinner, 489 U.S. at 622. See also Von Raab, 489 U.S. at 667; International Broth. of Teamsters, 932 F.2d at 1299-1300.

Here, however, the officials who decided Rutherford should be tested did exercise significant discretion -- indeed, departing from the literal language of the substance abuse policy. It also is of importance that Rutherford was given no advance warning of the testing. Not only did the substance abuse policy on its face fail to alert him, but the city officials who called him in to work

---

[7] The parties disagree about whether Rutherford knew that a substance abuse policy had been put into effect in early 1991, while he was on leave. Even if he had some general awareness, however, it appears undisputed that he had no occasion while out of work to receive an explanation of its applicability.

also did not tell him that the test would be administered the day he returned.[8]

This sort of unwarned testing is, we think, the most intrusive possible, contravening all of one's reasonable expectations of privacy. In Skinner, testing was triggered by accidents, other safety-related incidents, and rule violations. In Von Raab, testing was required only for employees who sought transfer or promotion to certain positions, and the employees were notified in advance of the scheduled sample collection. 489 U.S. at 672 n.2. In both cases, the employees knew when testing would, or could, occur. Even when drug screening is not linked to any event, and truly is random, employees typically know that they are subject to unannounced testing: "Drivers will be aware of the existence of a random drug-testing scheme, so while the precise time of the test will be unknown, the fact that they are subject to this search

---

[8] In Findings of Fact and Conclusions following Rutherford's post-termination grievance hearing, the City Personnel Hearing Officer reported the testimony of a Personnel Testing Analyst that she had asked Rutherford whether he wanted to take the drug test the same morning as his physical or wait until later.

> Martinez [the analyst] said that Rutherford replied, "Might as well get it out of the way". Rutherford stated that he remembered speaking with Martinez . . . , but she only told him where to sign the appropriate forms.

We found no further reference to this factual dispute in the record and, consequently, consider it of limited significance. Presumably, if Rutherford were given the option of waiting a meaningful period of time after his return to work, the City would have so informed us -- in light of Rutherford's repeated assertion that he was subjected to a surprise test, without any advance warning. An option to delay the test a short time would not lead us to a different result.

procedure will not be a surprise."   International Broth. of Teamsters, 932 F.2d at 1303.[9]  This knowledge, the Ninth Circuit observed, means that "the amount of anxiety should not be substantial," id.   The privacy intrusion consequently is less severe.  The Supreme Court acknowledged the importance of notice in the Fourth Amendment calculus in Von Raab, where it identified advance notice as a factor that minimized the testing program's intrusion on privacy.  See 489 U.S. at 672 n.2.

Nor were other factors present to diminish Rutherford's expectation of privacy.  Unlike the workers in  Skinner or the jockeys and other horse race participants in Dimeo v. Griffin, 943 F.2d 679, 681 (7th Cir. 1991) (en banc), he does not serve "in an industry that is regulated pervasively to ensure safety," Railway Labor, 489 U.S. at 627.[10]  His job does not implicate the national concerns underlying the Supreme Court's conclusion in Von Raab, where the Court noted that Customs employees who carry firearms or enforce drug laws -- "[u]nlike most private citizens or government

_____

[9] The plan at issue in American Federation of Gov't Emp. v. Cavazos, 721 F. Supp. 1361 (D.D.C. 1989), aff'd in part, vacated and remanded in part, AFGE v. Sanders, 926 F.2d 1215 (D.C. Cir. 1991), for example, provided that, in addition to the general 60-day notice of its implementation, each employee subject to random testing be given individual notice stating that his or her position was selected as sensitive, or "testing designated," and that the employee could be tested 30 days after the date of the notice.

[10] In addition to safety concerns, the regulation of horse racing stems from its status as a "magnet for gambling" and its "shadowed[] reputation, growing out of a long history of fixing, cheating, doping of horses, illegal gambling, and other corrupt practices."  943 F.2d at 681.

-11-

employees in general," id. at 672 -- "reasonably should expect effective inquiry into their fitness and probity."[11]

The City's interest in ensuring safety, meanwhile, appears to have been at a fairly low ebb with respect to Rutherford's test. First, he was not a new employee whose work habits were unknown. The City had had substantial experience -- a decade -- with Rutherford, and presumably detected no signs of drug or alcohol abuse during that period.[12] See Willner v. Thornburgh, 928 F.2d 1185, 1193 (D.C. Cir. 1991)[13] Second, he was not moving to a more safety-sensitive position; his previous job as a bus driver was at

---

[11] The Court observed that "[t]he Customs Service is our Nation's first line of defense against one of the greatest problems affecting the health and welfare of our population," referring to "`the veritable national crisis in law enforcement caused by smuggling of illicit narcotics.'" 489 U.S. at 668 (citation omitted).

[12] We do not mean to suggest that a drug testing program may not be applied to employees with substantial tenure. We note this factor here only because the City seeks to justify testing Rutherford as a "new" hire.

[13] Willner involved the suspicionless testing of applicants for Justice Department attorney positions. The court observed that "[t]he government's interest in detecting drug use is substantial at the pre-employment stage because . . . the applicant is an outsider." It also noted:

> The fact remains that the applicant is a person the government, as prospective employer, has had no opportunity to observe in the setting of the workplace. . . . In regard to incumbents . . . , direct observation together with the reasonable suspicion test may uncover those employees who ought to be tested. That obviously is not true for applicants and is another factor to be weighed in favor of finding it "impractical" for the Justice Department to obtain warrants or information leading it to suspect drug use before requiring candidates for employment to be tested.

least as safety-sensitive as the new job to which he was assigned. There was no change in his status, therefore, requiring more caution with him than with other employees who were subject to testing only upon expiration of their commercial driver's licenses. Third, the absence of notice to Rutherford that he would be tested on the day he returned to work deprived the City of any deterrence justification for administering the test to him.

Finally, because he had not been at work in more than a year, even a positive test result could have revealed nothing about his work behavior unless it showed that he presently was under the influence of drugs. Although we do not minimize the importance of detecting impaired employees, the fact that such tests may show only that the employee was exposed to drugs weeks earlier means that Rutherford's testing would be a uniquely unreliable gauge of his on-the-job conduct.[14] While past drug exposure by regular employees could reflect use while they were at work, such an inference is not possible for an employee who has been on an extended medical leave until the day of the test.[15]

In sum, even conceding that the City has an important safety interest in ensuring that its heavy truck drivers are free from

---

[14] It is uncontroverted that the test administered to Rutherford was incapable of determining the timing, amount, or manner of the marijuana exposure.

[15] The City admitted in its answer to the complaint and in its Responses and Objections to Plaintiff's Requests for Admissions that "the drug test given to Jerry Rutherford on April 15, 1991, could not possibly have demonstrated drug use or impairment at work or in the workplace."

drugs, that interest in this case is considerably diluted by the factors we have just discussed. We conclude that, when balanced against the unusually intrusive nature of the testing as described above and the fact that a positive test leads inexorably to termination, this diluted interest must give way to Rutherford's expectation of privacy. Cf. Willner, 928 F.2d at 1188 ("The protections of the Fourth Amendment are graduated in proportion to the privacy interests affected. Decreasing levels of intrusiveness require decreasing levels of justification"). [16]

Accordingly, we hold that the City's testing of Rutherford constituted an unreasonable search in violation of the Fourth Amendment.

### III. Due Process [17]

---

[16] We note that the relative weights of the interests in Skinner and Von Raab do not constitute a standard that must be met in every case. The Court noted recently that, although the government interest in both of those cases was characterized as "compelling,"

> [i]t is a mistake . . . to think that the phrase "compelling state interest," in the Fourth Amendment context, describes a fixed, minimum quantum of governmental concern, so that one can dispose of a case by answering in isolation the question: Is there a compelling state interest here? Rather, the phrase describes an interest which appears important enough to justify the particular search at hand, in light of other factors which show the search to be relatively intrusive upon a genuine expectation of privacy.

Vernonia Sch. Dist. 47J v. Acton, 115 S. Ct. 2386, 2394-95 (1995) (emphasis in original).

[17] Our disposition of the Fourth Amendment issue gives Rutherford a basis for reinstatement and damages. We nevertheless think it appropriate to address why his due process claim does not fair as well.

Rutherford argues that the City denied him procedural due process in terminating him based on the positive drug test. He claims that he was not given a meaningful opportunity to challenge the City's decision to discharge him "[b]ecause there was nothing [he] could do or say that would mitigate or alter the City's use of the positive drug test to terminate his employment . . . ." He also contends that the City unfairly put the burden of proof on him to show the absence of just cause, arguing that the City instead should have been required to prove beyond a reasonable doubt or with clear and convincing evidence that there was just cause for the firing.

We recently have rejected essentially the same claims involving the same policy, see Saavedra v. City of Albuquerque, No. 94-2220 (10th Cir. Jan. 17, 1996), and we see no reason to reach a different conclusion here. Rutherford's primary objection is to the City's equating a positive drug test with just cause for discharge. As the Supreme Court has noted, however, there can be no doubt "that drug abuse is one of the most serious problems confronting our society today," Von Raab, 489 U.S. at 674. In the face of that reality, the City's decision to treat a positive drug test as "just cause" for immediate discharge of employees deemed safety sensitive, though harsh, is not irrational and cannot be held offensive to the Constitution.[18]

_____

[18] We note the Supreme Court's observation that "a prior hearing facilitates the consideration of whether a permissible course of action is also an appropriate one," Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 543 n.8 (1985). Although it was

-15-

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion. Costs to appellant.

---

to no avail, Rutherford did have the opportunity in his pre- and post-termination hearings to urge departure from the City's "zero tolerance" drug policy.