# United States Court of Appeals for the Federal Circuit

---

**SCOTT HOLTON,**
*Petitioner*

**v.**

**DEPARTMENT OF THE NAVY,**
*Respondent*

---

2017-1430

---

Petition for review of the Merit Systems Protection Board in No. PH-0752-15-0475-I-1.

---

Decided: March 9, 2018

---

JAMES G. NOUCAS, JR., Noucas Law Office, Portsmouth, NH, argued for petitioner.

KRISTIN MCGRORY, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by CHAD A. READLER, ROBERT E. KIRSCHMAN, JR., CLAUDIA BURKE.

---

Before NEWMAN, DYK, and O'MALLEY, *Circuit Judges*.

DYK, *Circuit Judge*.

Scott Holton petitions for review of the decision of the Merit Systems Protection Board ("Board") affirming his removal. Mr. Holton was employed as a rigger supervisor for the Navy at the Portsmouth Naval Shipyard. He was dismissed after testing positive for a prohibited substance in a drug test administered in the aftermath of a crane accident. Because there was reasonable suspicion that Mr. Holton caused or contributed to the accident, the drug test was properly administered and did not violate Mr. Holton's constitutional rights or the standard of the applicable regulation. We also conclude that Mr. Holton has not established the existence of any prejudicial procedural error. We affirm.

BACKGROUND

Mr. Holton was formerly employed by the Department of the Navy as a rigger supervisor at the Portsmouth Naval Shipyard ("PNS"). Mr. Holton had been employed at the shipyard since January 8, 2007. He was first employed as an apprentice rigger helper and then a journeyman rigger for two years. He was promoted to worker leader and then to rigger supervisor. As supervisor of the crane team, Mr. Holton had the responsibility for the safety of those under his supervision, as well as for ensuring the safety of the vessels and structures at the Naval Yard during the crane operation.

On March 11, 2015, the petitioner's crew was using a portal crane to move submarine covers from the upper staging area to the landing area of Dry Dock 2. Submarine covers are large, modular structures that are assembled around docked submarines to provide shelter and protection. Each modular unit weighed roughly 60,000 pounds and measured approximately 48 feet long by 8 feet wide. In total, this operation required moving more than 100 modular units.

Before commencing the crane evolution, Mr. Holton briefed the crew and gave control over the crane to the authorized rigger in charge. Mr. Holton then left the crane, so that he could supervise preparation of the landing area with two other riggers from the crane team. From this position, Mr. Holton could not see the crane's boom as it moved. Before March 11, Mr. Holton's crew had performed approximately twelve to fifteen evolutions following the same route around Building 343, with the same crane operator (who had thirty years of service) and without any accidents or damage.

To reach its destination the load had to be maneuvered around a curve, in order to avoid hitting Building 343, a six-story building. Once the curve had been negotiated, the load was supposed to continue down a straightaway until it reached the landing place in the dry-dock area for delivery to the docked submarine. The curve around Building 343 was the most dangerous aspect of this particular crane operation. It was dangerous because the curve was so tight. In fact, the crane's travel motors often had trouble propelling the crane around it, sometimes making it necessary to wet the rails down to reduce friction.

During the movement around this curve on March 11, the crane boom struck Building 343, causing roughly $30,000 in damage. This occurred because the crane traveled too far on the inside of the curve, resulting in the load's being "20 to 30 feet away from being centered on the crane rail . . . well away from where it should have been." J.A. 409. This caused an imbalance in weight, which resulted in the crane's boom hitting Building 343 and becoming lodged in the building, six stories above the ground.

Navy Shipyard Portsmouth Instruction 12792.2B allows post-accident drug testing of employees, after an accident causing damage in excess of $10,000, when "their

actions are reasonably suspected of having caused or contributed to an accident or unsafe practice." J.A. 268. Trevor Thayer, acting party head of the Lifting and Handling Department, investigated the accident and determined whether drug testing was warranted. Based on his conclusions that a police log had been generated and that the damage exceeded $10,000, Mr. Thayer obtained permission from the executive director of the Shipyard, Mr. Banks, to drug test the entire crane team. In deciding whether or not to test the entire crane team, Mr. Thayer referenced the Navy's "crane team concept," concluding that the accident was the result of a failure by the entire team as a whole. Under this "crane team concept," crane team members are responsible for "watching out for each other . . . [a]nd . . . bringing attention to what's going on" in order to prevent any potential problems. J.A. 415.

Mr. Thayer orally informed all the members of the crane team, including Mr. Holton, that they were going to be drug tested due to the severity of the accident. Mr. Holton took the test, signed the seals for his urine specimen, and also signed a checklist certifying that the drug-testing contractor's employee had taken the proper steps in the collection process. Two days after Mr. Holton provided his urine sample, the Navy issued him written notice explaining that the reason for the drug test was the March 11 accident.

Mr. Holton's sample was tested twice and found positive for marijuana both times. Mr. Holton's test result was 150 times greater than the allowable marijuana testing cutoff of 15 ng/ml. Marijuana is specifically prohibited by Navy Shipyard Portsmouth Instruction 12792.2B. Instruction 12792.2B requires "civilian personnel refrain from using any illegal drugs," J.A. 251, and then specifically lists "cannabis (marijuana)" as a prohibited drug. J.A. 261. On March 31, 2015, following his first positive test result, the Navy placed Mr. Holton on

paid, nonduty status. On May 15, 2015, the Navy proposed his removal, and after Mr. Holton responded both orally and in writing, the Executive Director removed him, effective July 8, 2015.

Mr. Holton appealed his dismissal to the Board, and, on March 18, 2016, the administrative judge ("AJ") issued an initial decision upholding Mr. Holton's removal. The AJ decided that the Navy had properly selected Mr. Holton for testing, given that he was the first-line supervisor of the employees operating the crane at the time of the accident. The AJ found that Mr. Holton's drug test was valid and that the Navy had established its charge of illegal drug use, and rejected Mr. Holton's affirmative defense of harmful procedural error. In particular, the AJ found that the Navy's failure to provide Mr. Holton with advance written notice of why he was being tested, as required by its drug-testing regulation, was a harmless error, because it did not change the outcome of the test. The AJ thus sustained the removal.

Mr. Holton filed a petition for review with the Board. On November 2, 2016, the Board affirmed Mr. Holton's removal. *Holton v. Dep't of the Navy*, 123 M.S.P.R. 688, 691 (M.S.P.B. 2016). The Board determined that Mr. Holton's drug test was not a violation of the Shipyard Instruction or Mr. Holton's Fourth Amendment rights. *Id.* at 694-701. The Board agreed that it was reasonable for the Navy to suspect that Mr. Holton had caused or contributed to the accident because Mr. Holton had briefed the crane team immediately before the accident and was still actively involved in the operation when the accident occurred. *Id.* The Board also held the Navy had not prejudicially violated Mr. Holton's procedural rights. *Id.* at 699-701.

Mr. Holton filed a timely petition for review with our court. We have jurisdiction subject to 5 U.S.C. § 7703(b)(1)(A). We affirm the decision of the Board

unless it is: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence."  5 U.S.C. § 7703(c).

## DISCUSSION

### I

Mandatory drug testing conducted by or required by the federal government is a search within the meaning of the Fourth Amendment.  No warrant is required, but the test must be reasonable to pass constitutional muster. *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989); *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 616-33 (1989).

*Skinner* involved challenges to drug-testing regulations issued by the Federal Railroad Administration.  A group of railway trade unions sued to have the regulations declared unconstitutional under the Fourth Amendment.  *Skinner*, 489 U.S. at 616-19.  The regulations included mandatory blood and urine tests of employees involved in train accidents to determine if they were using illegal drugs.  *Id.* at 608-12.

The Supreme Court held that post-accident drug testing, performed without a warrant, can be a reasonable intrusion into an employee's privacy rights, upholding two subparts of the regulations.  *Id.* at 624-34.  The first part required railroads to test employees "directly involved" in certain severe accidents, including accidents resulting in death or property damage exceeding $500,000.  *Id.* at 609.  The Court also upheld a second part permitting railroads to conduct testing "after a reportable accident or incident, where a supervisor has a 'reasonable suspicion' that an employee's acts or omissions contributed to the occurrence or severity of the accident or incident . . . or . . . in the event of certain specific rule violations."  *Id.* at 611.  Both

parts were considered "reasonable within the meaning of the Fourth Amendment." *Id.* at 634. A variety of factors supported the reasonableness of the drug testing, among them, (1) the "limited" privacy intrusions occasioned by the testing procedures, *id.* at 624; (2) the diminished expectation of privacy that attaches to employment in an "industry that is regulated pervasively to ensure safety," *id.* at 627; and (3) the government's "compelling" interest in railway safety, *id.* at 633, an interest that could not always be protected by testing only upon individualized suspicion, *id.* at 629-34.

The Navy's drug testing instruction here parallels the second subpart of the regulations upheld in *Skinner*. The Navy's instruction authorized post-accident drug testing of employees after an accident resulting in death or hospitalization, or property damage in excess of $10,000, if a supervisor "reasonably suspect[s]" that an employee's acts "caused or contributed to an accident or unsafe practice." J.A. 268. The relevant regulation, Navy Shipyard Portsmouth Instruction 12792.2B provides:

> Post-Accident Testing of employees, based on a police report, suspected of having caused or contributed to an accident if there is a death or personal injury resulting in hospitalization, or if there is property damage in excess of $10,000.
>
> (1) Criteria. Employees may be subject to testing when, based upon circumstances of an on-the-job accident or unsafe, on-duty, related activity, their actions are *reasonably suspected of having caused or contributed* to an accident or unsafe practice that meets either of the following criteria:
>
> (a) The accident or unsafe practice results in a death or personal injury requiring admission to a hospital, or

(b) The accident or unsafe practice results in damage to government or private property estimated to be in excess of $10,000.

J.A. 267-68 (emphasis added). Neither party disputes that this Navy regulation is consistent with *Skinner*.

The reasonable-suspicion inquiry under the Fourth Amendment and under the regulation is an objective test. *See, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 738-39 (2011). It depends only upon "the factual information [the supervisor] had when he made the determination, and not on the basis of additional information that subsequently was disclosed or which . . . could have [been] discovered by further inquiry." *Garrison v. Dep't of Justice*, 72 F.3d 1566, 1568 (Fed. Cir. 1995). It is correspondingly well established in the context of so-called *Terry* stops that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Whren v. United States*, 517 U.S. 806, 813 (1996) (quoting *Scott v. United States,* 436 U.S. 128, 138 (1978)); *accord Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). We think that this rule applies in this particular context as well and that the subjective state of mind of the official ordering drug testing is irrelevant.[1] We thus consider whether the circumstances surrounding the accident, taken objectively, would cause one to "reasonably suspect" that Mr. Holton caused or contributed to the accident.

---

[1] Courts, of course, can inquire into the subjective motivation of officials in order to ascertain whether there was an improper motivation, such as racial animus. *See, e.g., City of Indianapolis v. Edmond*, 531 U.S. 32, 46 (2000). No such allegation is made here.

The question of reasonable suspicion is not limited to situations in which the employee took an affirmative action that caused or contributed to the accident. The constitutional standard also includes an employee's failure to take an action that could have prevented the accident. Indeed, the failure to act was a relevant factor in the regulations upheld in *Skinner*, where the Court authorized that "[b]reath or urine tests, or both, may be ordered (1) after a reportable accident or incident, where a supervisor has a 'reasonable suspicion' that an employee's *acts or omissions* contributed to the occurrence or severity of the accident or incident." 489 U.S. at 611 (emphasis added). The failure to act must be judged by the scope of the employee's job duties.

Here, Mr. Holton argues that the Navy's "crane team concept" was not a permissible approach to define the scope of those subject to drug testing. Mr. Holton contends that, because the Navy relied on this "crane team concept," his subsequent drug test was improper. Under the "crane team concept," all members of the crane team share responsibility for ensuring the safe and successful performance of any crane operation, and all individuals either succeed or fail as a team to accomplish this goal. The Navy argued that this concept made it reasonable to suspect that every member of the team, including Mr. Holton, caused or contributed to the accident.

Designating responsibility for the accident to all team members and testing all members of the crane team is essentially the "test all involved employees" approach discussed in *Skinner*. *See* 489 U.S. at 609 & n.2. The Court has only permitted a "test all involved employees" approach when precipitated by the most severe accidents, which in *Skinner* was defined as accidents involving a fatality, the release of hazardous materials resulting in evacuation or injury, or damage amounting to at least $500,000. *See id.* With respect to less severe accidents, such as the one at issue here, the Supreme Court only

approved testing regimes that involve assessment, in the language of the applicable Navy regulation, when there is "reasonabl[e] susp[icion]" that the individual employee "caused or contributed to the accident or unsafe practice." J.A. 268.

Mr. Holton argues that the Navy lacked "reasonable suspicion" that he "caused or contributed" to the accident under the objective standard. Having delegated responsibility to the rigger in charge, Mr. Holton was at least 150 yards away from the crane at the time of the accident and, thus, could not see the crane's boom and was not actively involved in the moving of the crane. He points out that PNS Code 740 Policy #52 does not require the supervisor to remain with the crane during the evolution. The crane team supervisor is even authorized to "leave the job site for short periods of time." J.A. 54.

Mr. Holton further argues that as a supervisor, his decision to remove himself during the crane evolution was required by the "blue and gold do not mix" policy. Under the "blue and gold" policy, set forth in PNS Code 740 Policy #51, the overall supervisor is generally instructed to "separate yourself from the [rigger in charge]," so as to avoid a situation where the chain of command is unclear. J.A. 53.

Mr. Holton is correct that Policy #52 did not require him to remain with the crane, but he is incorrect that Policy #51 forbade it. Policy #51 provides for separation between the supervisor and rigger in charge "*unless* [they] are both at the working end of the crane or *the area of most risk*." J.A. 53 (emphasis added). As Mr. Thayer testified, and as discussed above, the rotation around the building was the most complicated, and dangerous, part of the lift. Therefore, under the relevant policy, it would not have been improper for Mr. Holton to remain with the rigger in charge when guiding the crane through the curve, as it was the area of most risk. Mr. Thayer testi-

fied that he would have preferred Mr. Holton to stay with the crane, and that if Mr. Holton had been present during the move, he might have been able to prevent the accident.[2]

While Mr. Holton may not have violated the Shipyard's rules with respect to his positioning during the crane evolution, Mr. Holton's job was to do what was necessary to ensure that the crane operation was performed safely and successfully. PNS Policy #51 specifically expects all supervisors to "[s]top and correct improper rigging" and "[e]nsure the crane team is operating safely and meeting standards." J.A. 53. Given Mr. Holton's overall responsibility for the lift, it was reasonable for the Navy to suspect in the immediate aftermath of the crane accident that the incident was, at least in part, caused by something the team supervisor either did or failed to do. We agree with the Board that "[b]ecause the record re-

---

[2] When asked how he had come to the conclusion that Mr. Holton could have prevented the accident, Mr. Thayer responded:

> Had [Holton] been with the crane and in that role of Supervisor watching the entire operation as a whole, not having the responsibility for handling a tagline or signaling a crane, not being distracted by other things – Supervisors that's what they do. They step back and they look at the big picture. I believe that he could have seen that load, not being centered on the rail and prevented this.
>
> Q: He could have seen the load.
> A: Yes.
> Q: But you're speculating on that. Aren't you?
> A: Yes.

J.A. 429. That Mr. Thayer might have engaged in speculation is not inappropriate, because the relevant standard only requires reasonable suspicion.

flects that [Mr. Holton] instructed the crane team immediately before the accident and was still actively involved in the operation when the accident occurred, we find that it was reasonable for the agency to suspect that he . . . caused or contributed to the accident." *Holton*, 123 M.S.P.R. at 699.

To be sure, at the time that testing was ordered, Mr. Holton's supervisor could not have known for certain whether Mr. Holton had caused or contributed to the accident. But drug testing, if it is to be meaningful, must occur very soon after the accident and preferably on the same day. *Skinner* itself recognized the importance of prompt testing. In *Skinner*, the Court declined to impose a warrant requirement on drug testing, partially because "alcohol and other drugs are eliminated from the bloodstream at a constant rate." 489 U.S. at 623. The Court recognized that "blood and breath samples taken to measure whether these substances were in the bloodstream when a triggering event occurred must be obtained as soon as possible." *Id.*

In *Skinner*, the Court acknowledged that, given the short timeframe, reasonable suspicion will often be based on the incomplete information assembled at the time of the testing decision. *Id.* at 631. The relevant standard is whether it is reasonable to *suspect* that the employee caused or contributed to the accident, not that there was necessarily such a connection. The Board did not err in concluding that the test here met the applicable constitutional and regulatory standard.

## II

Mr. Holton's remaining arguments do not provide a basis to overturn the Board's decision.

Mr. Holton argues that he did not receive adequate written notice of the drug test. The Fourth Amendment imposes no such requirement. Other circuits have found

it reasonable to subject employees to drug testing without formal notice. In *Carroll v. City of Westminster*, the court held that "knowledge that [an employee] is subject to random drug tests is of no small importance. Although 'the precise time of the test will be unknown, the fact that [employees] are subject to this search procedure will not be a surprise,' and thus '[t]he privacy intrusion consequently is less severe.'" 233 F.3d 208, 211 (4th Cir. 2000) (second and third alterations in original) (quoting *Rutherford v. City of Albuquerque*, 77 F.3d 1258, 1262 (10th Cir. 1996)); *cf. Nat'l Treasury,* 489 U.S. at 667-77, 676 n.4 (finding that random drug tests are permitted for certain employees, provided that employees have general notice that they are subject to the testing requirement). Mr. Holton does not contend that he was unaware of the drug test policy and prohibitions of the Naval Yard. The Navy Shipyard Portsmouth Instruction 12792.2B, issued on November 8, 2010, advised all employees on the policies and procedures related to drug testing at the Shipyard.

Even though the Fourth Amendment does not require written notice in advance, Mr. Holton points out that the applicable drug test instruction requires that the Navy "will notify the employee of the test and issue the specific written notice that the employee is being tested because of the accident or unsafe practice." J.A. 269. Although Mr. Holton received oral notice of the drug test, he did not receive written notice of testing until March 13, 2015, two days after the accident. The Board held that the lack of notice was harmless error, as it did not change the outcome of the test.

Mr. Holton contends that, if provided written notice, he may have declined to take the drug test. While Mr. Holton posits that the requirement for written notice prior to testing avails the employee of the opportunity to refuse drug testing, we think that the notice is aimed at ensuring that the employee will be present at the drug test and be able to request deferral under appropriate

circumstances. The purpose of notice is not to provide an opportunity to challenge the propriety of the test, a claim that may be raised as a defense to discipline. Indeed, if Mr. Holton had refused the drug test, he would have been subject to a variety of disciplinary actions, detailed in Navy Shipyard Portsmouth Instruction 12792.2B. The failure to provide written notice was ultimately not harmful error.

Mr. Holton points out that the regulation requires drug testing be "based on a police report," J.A. 267, and argues that "Thayer did not review a police report as no such report existed." Petitioner Br. 30-31. However, the Board found, and we agree, that the Police Desk Journal was sufficient to meet the police report requirement.

Finally, Mr. Holton's rights were not violated merely because the deciding official was the same individual who authorized administration of the drug test. In *DeSarno v. Department of Commerce*, this court held that "[t]he law does not presume that a supervisor who proposes to remove an employee is incapable of changing his or her mind upon hearing the employee's side of the case." 761 F.2d 657, 660 (Fed. Cir. 1985); *see also Jolly v. Dep't of the Army*, No. 2017-1919, 2017 WL 3980536, at *3 (Fed. Cir. Sept. 11, 2017) (unpublished decision); *Franco v. Dep't of Health & Human Servs.*, 852 F.2d 1292, 1988 WL 54653, at *1 (Fed. Cir. 1988) (unpublished table decision); *Hanley v. Gen. Servs. Admin.*, 829 F.2d 23, 25 (Fed. Cir. 1987). We do not presume that a supervisor, in this case Mr. Banks, who authorized a drug test, is incapable of changing his mind regarding the propriety of that authorization.

CONCLUSION

Because we find that there was reasonable suspicion that Mr. Holton, through his actions or inactions, contributed to the accident, we find that the Board did not err in concluding that the Navy was justified in requiring that

Mr. Holton submit to drug testing. Neither Mr. Holton's constitutional rights nor the standard of the regulation was violated by the test. Nor did the Navy prejudicially fail to follow the required procedures. Mr. Holton's subsequent dismissal was not contrary to law, arbitrary and capricious, or unsupported by substantial evidence.

**AFFIRMED**